■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LARRY GURLEY, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Kings County, rendered November 10, 1972, convicting him of murder and attempted murder, on a jury verdict, and imposing sentence. Judgment affirmed. The factual issues were determined after a charge which was substantially correct. No exceptions were taken to the charge, and the only request to charge made was amply covered in the charge. Gulotta, P. J., Rabin and Titone, JJ., concur; Cohalan, J., dissents and votes to modify the judgment by reducing the convictions of murder and attempted murder to manslaughter in the first degree and attempted manslaughter in the first degree, with the following memorandum: On the credible testimony adduced at the trial, the crimes of murder and attempted murder were not, in my judgment, proved beyond a reasonable doubt. The evidence more fully comports with verdicts of manslaughter in the first degree and attempted manslaughter in the first degree (see CPL 470.15, subd 2, par [a]). Margett, J., dissents and votes to reverse the judgment and

dismiss the indictment, with the following memorandum: I dissent and vote to reverse the judgment on the grounds that (1) the Trial Judge's charge on the subject of justification suffered from highly prejudicial defects of omission and commission and (2) the evidence adduced at the trial was not legally sufficient to establish defendant's guilt beyond a reasonable doubt. The former failing would require a new trial (see CPL 470.20, subd 1), but because of the latter even more critical and fundamental failing, the indictment must be dismissed. Accordingly, I vote for the latter corrective action, viz., dismissal (see CPL 470.20, subd 2). Defendant stands convicted of the August 30, 1971 gunshot murder of Jose Moreno and the attempted murder of Felix Miranda. The shootings allegedly took place in front of a two-family house in Brooklyn in which the two major prosecution witnesses resided; Beulah Gowins lived on the second floor, Juanita Miranda lived downstairs. Juanita Miranda was the only person the prosecution produced who testified that she saw defendant fire the gun. She testified at the trial in March, 1972 that on August 30, 1971, she had been on welfare, and since 1969, had been separated from her husband, Felix Miranda. However, four of her five children were by Felix, the youngest child by him having reached his second birthday in May, 1972. Juanita Miranda testified that until she entered a "drug-free" program in October, 1971, she was on drugs, using about four bags of narcotics per day. She further testified that her husband didn't work; that he was a "stick up artist" and that he was in the habit of carrying around "a few" guns with him. Defendant testified that some time before August 30, 1971 Felix Miranda had demanded of him the address of defendant's friend "Robert" (Juanita's boyfriend, by whom she had become pregnant). Defendant replied that he only knew the block on which Robert lived. Because of the refusal to furnish the actual address, Felix shot defendant in the right arm a week before the subject incident. The bullet shattered defendant's ulna and he was in the hospital for two days, emerging with his right arm encased in a double cast down to his knuckles. Defendant is righthanded. According to the defendant, on August 30, 1971 Beulah Gowins called him up at about noon and told him to come over to her house. Defendant told her that his mother was shopping and that he was "watching the kids" but would be over as soon as possible. At about 5:00 P.M. Gowins came over to get him. As they walked to her house he asked Gowins how Juanita Miranda was doing. Gowins told him that Juanita Miranda was not feeling too well; she was seven months' pregnant "by a friend of [defendant], named Robert Stuckew" and had had stomach pains "all last night". Defendant and Beulah Gowins arrived at the latter's apartment and, about two minutes later, Felix Miranda entered with a male friend. Defendant testified that Felix then "looked at" Beulah, and said something to her in Spanish. She then said to defendant "Larry, I do not want any trouble in my house. Would you please leave?" At that moment Felix and his friend were standing near the door. Felix had his hand in his pocket, his friend then left to go downstairs. Juanita was in the bedroom of Beulah's apartment during all of that time. Defendant then left with Felix, following right behind as they walked downstairs. According to defendant, at the foot of the stairway and at the doorway to the house, he saw, standing to his right ("he appeared to be hiding"), the man who had accompanied Felix to Beulah's apartment and had then left. Another man (apparently the deceased, Moreno) was standing in the center of the doorway. As defendant and Felix reached the bottom landing, Felix began hitting defendant on the head with a pistol. Defendant turned, grabbed the gun barrel with his left hand and struck Felix with his right-arm cast. The

gun went off, wounding Moreno. The struggle between defendant and Felix spilled over, with defendant falling into the street and Felix the other way. Felix then came over and began to stomp and kick defendant. Felix hit him in the face and then lunged toward the gun to pick it up, but defendant grabbed it and shot Felix. At that time Moreno was leaning upon some garbage cans. The third man had run down the street as soon as the shooting started. Defendant then staggered home and, later that evening, surrendered himself to the police. Thus, defendant's version was that he was assaulted by Felix Miranda and, in the course of the ensuing life-and-death struggle, Moreno was shot accidentally and Felix Miranda had been shot in self-defense. The prosecution presented a totally different version. Their witnesses to the events, Juanita Miranda and Beulah Gowins, painted a picture containing none of the self-defense elements related by defendant and was to the effect that defendant fired the gun deliberately and without justification, and did so from the street, aiming toward the doorway of the building. Thus, Beulah Gowins testified that when defendant had entered her apartment she noticed that in his waistband he had what "looked like" a gun (later in her testimony she became positive that it was a gun). She testified that the defendant, and then Felix left after Felix' companion left. She looked down the stairs but saw no struggle. She then looked out of her kitchen window and saw defendant standing on the corner of Glenmore and Jerome Avenues, facing the building and talking. She saw a space of at least 10 feet in front of him. She turned her attention away but, seconds later, heard about eight or nine shots. Moments later Felix Miranda and the "other guy" (Jose Moreno) came upstairs, wounded. Juanita Miranda testified that while defendant and Felix were in Beulah's apartment she stayed in the front bedroom of the apartment, sitting on a bed reading a book. Felix came into the bedroom, talked to her and then left. She then looked out the window and saw defendant outside, facing the building, and talking. He then removed his (cast-enclosed) arm from the sling, placed it at the midsection of his body and, from that part of his body, and with his right arm, removed a gun, placed it in his left hand, and, stating: "When I put my hand in my pocket, I don't put it in there for nothing", swung around and started shooting. He fired at least four times and, when one of Felix' friends "came out of nowhere", defendant chased him down Glenmore Avenue, shooting at him. The man being so chased by defendant was the one who had just accompanied her husband to Beulah's apartment and was not the one who had stayed downstairs. Juanita did not explain the means by which, while inside her bedroom, she knew the identity of both the man who accompanied her husband to Beulah's apartment and the identity of the man who was waiting downstairs. Presently, Felix, now wounded, and the other wounded man (Moreno) staggered into the apartment. Neither of the wounded men was armed. Jose Moreno died from the bullet that had entered through his chest. The fatal bullet was of small caliber, estimated to be a .25 caliber, and it could readily be inferred from the prosecution's evidence that it was fired from at least 10 feet from Moreno and Felix Miranda. That type of bullet is generally fired from a .25 caliber automatic, some qualities of which were described by defendant's firearm expert: "Q * * * First of all, sir, I ask you, is a .25 automatic an accurate weapon? A No, it's not. It's claimed to be like a belly gun, strictly from me to the juror, or closer. Q About five or six feet? A Yes "THE COURT: Beyond that, there is no accuracy? THE WITNESS: There is no accuracy in it. BY MR. MILLER: Q You would have to be lucky to hit anybody? A You might hit them. You are not going to hit where you are aiming at. You can't pinpoint, unless you are a

master shot." The autopsy report stated that the fatal bullet had followed a slightly *downward* course in entering Moreno's body. The testimony of defendant's ballistics expert strongly tended to disprove the prosecution theory and to support defendant's version. Thus, the prosecution evidence was to the effect that, from the street, a right-handed man, with his right arm ·in a cast as a result of a shattered ulna, deliberately and knowingly "took on" Felix Miranda (a "stick up artist" in the habit of carrying a "few" guns), and two companions, and that defendant chose to accomplish this task on a public street by using his cast-enclosed arm to transfer a small-caliber, generally inaccurate "belly" gun into his left hand, making an announcement which could be heard on the second floor, and firing at the entranceway to the building. The prosecution case was built upon testimony of the drug-addict, living-on-welfare wife of the "stick-up artist", having children by him but claiming to be separated from him. Though Juanita claimed otherwise, the inference is strong that, at the time of the shooting and the ensuing police investigation, she and her drug addiction were being supported by means of a welfare fraud in which she and Felix were engaged, and also by means of the fruits of Felix' "profession". She had strong reason to protect Felix and to see that he would not be charged with and convicted of a crime. Not surprisingly her version made defendant—not Felix—the murderer. Felix did not testify at the (March, 1972) trial because, in an incident unrelated to the case at bar, he was shot on January 1, 1972 and died of his wounds a week before the trial. On this quality of testimony, defendant clearly should not have been convicted; his guilt was not established beyond a reasonable doubt. Thus, the judgment of conviction should be reversed, and the indictment dismissed. Were the indictment not to be dismissed, a new trial would have to be ordered because of three prejudicial deficiencies in the trial court's charge with respect to the defense of justification: (A) The core of the case, of course, was whether defendant acted in self-defense. Yet the court omitted to charge subdivision 1 of section 25.00 of the Penal Law, viz.: "When a 'defense,' other than an 'affirmative defense,' defined by statute is raised at a trial, the people have the burden of disproving such defense beyond a reasonable doubt." Under the facts of this case, the failure to so instruct the jury was highly prejudicial error (see *People v Robinson*, 47 AD2d 618; *People v Soto*, 38 AD2d 734; *People v Wrench*, 34 AD2d 1055). (B) Further, largely because of that omission in the court's charge, the instructions with respect to "intent" unduly overshadowed and were not correlated with instructions as to justification, the result of which was that the instructions conveyed the impression that the prosecution had only a single burden of proof—that of proving intent to kill beyond a reasonable doubt. In this manner the prosecution was inadvertently relieved of the burden of *also disproving* the defense of justification beyond a reasonable doubt; intent to kill and justification not necessarily being mutually exclusive under the facts of this case. The unintended result of these deficiencies was that the burden of *proving* justification beyond a reasonable doubt was placed upon *defendant*. (C) Finally, prejudicial error was committed when the trial court, having charged (in accordance with Penal Law, § 35.15, subd 2, par [a]) that: "He reasonably believes that such other person is using or about to use deadly physical force; and even in such a case, however, the actor may not use deadly physical force if he knows that he can with *complete safety* as to himself and others, avoid the necessity of so doing by retreating", then charged: "Do you understand that? If a person is using deadly physical force against you, you do not have to use deadly physical force against him if you have a *chance* to retreat. If you

cannot retreat, then, of course, you are justified in saving your own life. Self-preservation is the first law of nature as well as the law of the State of New York" (emphasis supplied). This "shrinkage" of defendant's statutory rights was prejudicial because, while under defendant's version he was not *physically* "up against a wall" or physically barred from retreating, he may have reasonably believed that, having a week previously been shot in the arm by Felix Miranda, he would now risk a shot in the back if he exercised his physical "chance" to retreat. Thus, the "complete safety" element was lost in the shrinkage. Defendant's trial counsel did not take exception to the deficient charge; nor did he submit an alternative charge for the jury's consideration. Such failure, usually precludes appellate review (see CPL 470.05, subd 2) and is now cited by appellate counsel as one of the many alleged failings by defendant's trial counsel, purporting to demonstrate the inadequacy of his representation at the trial. I do not agree with that sweeping assessment of defendant's trial representation. However, this defendant *was* on trial for murder, attempted murder and assault in the first degree and, in a situation such as this, where the question of self-defense was at the core of the case, permeated the fabric of the entire trial and required that all of the testimony and evidence be examined through the prism of that defense, the trial court, *sua sponte,* should have charged the substance of subdivision 1 of section 25.00 of the Penal Law, and we, as a matter of discretion in the interest of justice, should review and act upon the three above-enumerated crucial deficiencies in the charge (see CPL 470.15, subd 6, par [a]; *People v Chestnut,* 42 AD2d 594; *People v Anderson,* 37 AD2d 728).